UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

CASE NO.: CV 17-01061 SJO (AJWx)          DATE: May 1, 2017

TITLE:   Wayne Yocum, et al. v. CBS Corporation, et al.

========================================================================
PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

Victor Paul Cruz                             Not Present
Courtroom Clerk                              Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**          **COUNSEL PRESENT FOR DEFENDANT:**

Not Present                                  Not Present

========================================================================
**PROCEEDINGS (in chambers): ORDER DENYING PLAINTIFFS' MOTION TO REMAND** [Docket No. 24]

This matter is before the Court on Plaintiffs Wayne Yocum ("Mr. Yocum") and Tina Yocum's ("Tina") (collectively, "Plaintiffs") Motion to Remand ("Motion"), filed March 13, 2017. Defendant CBS Corporation, formerly known as Viacom Inc., successor by merger to CBS Corporation, formerly known as Westinghouse Electric Corporation ("Defendant" or "Westinghouse") opposed the Motion ("Opposition") on March 20, 2017, to which Plaintiffs replied ("Reply") on March 27, 2017. The Court found this matter suitable for disposition without oral argument and vacated the hearing set for April 10, 2017. *See* Fed. R. Civ. P. 78(b). For the reasons stated below, the Court **DENIES** Plaintiffs' Motion to Remand.

I.   FACTUAL AND PROCEDURAL BACKGROUND

     A.   Factual Background

The following allegations are relevant to Plaintiffs' claims against Westinghouse.

Mr. Yocum served in the U.S. Navy from 1965-1972. (*See generally* Notice of Removal ("Removal"), Ex. A, First Am. Compl. ("FAC"), 2, ECF No. 1-1.) After completing boot camp, Mr. Yocum attended the Machinist Mate "A" school at Great Lakes Training Center in Illinois; the Nuclear Power School at Mare Island; and the Naval Power Training Unit located at Idaho National Engineering Laboratory ("INEL"). (FAC 2.) At INEL, Mr. Yocum attended a training course on the A1W prototype at the Nuclear Reactors Facility ("NRF") for approximately four months. (*See* Decl. of Kevin Jamison in Supp. Def's Opp'n ("Jamison Decl."), Ex. A, Pl.'s Resp. to Standard Interrogs. ("Pl.'s Interrogs.") 6, ECF No. 30-2.) The A1W was a working prototype of the *USS Enterprise*'s nuclear propulsion system, which provided the Navy with a platform for training soldiers to operate similar systems on other ships. (*See* Jamison Decl., Ex. B, ECF No. 30-3.) Mr. Yocum did not complete this training, but was instead transferred to join the crew of the *USS Jouett* in 1966, while it was under construction at the Bremerton Naval Shipyard in Washington. (*See* FAC 2-3; Pl.'s Interrogs. 6.) He remained aboard the cruiser until 1968. (FAC 2-3.) Mr. Yocum also served on

the *USS DeHaven* from 1968 to 1972.  (FAC 3.)  This four-year stint included the 1969 overhaul of the *DeHaven* at the Long Beach Naval Shipyard in California.  (FAC 3.)

Westinghouse supplied the asbestos-containing insulation that was installed, removed, handled, or otherwise manipulated in Mr. Yocum's presence.  (FAC 9.)  As a result of his exposure to the asbestos-containing insulation supplied by Westinghouse to the U.S. Navy, Mr. Yocum developed malignant mesothelioma, (FAC 9), and died on February 5, 2017.  (Mot. 1, ECF No. 24.)

      B.      Procedural Background

Plaintiffs initiated this action in the Superior Court of California for the County of Los Angeles ("Superior Court"), on August 11, 2016.  On January 6, 2017, Plaintiffs filed the FAC against various product and premises defendants, alleging strict products liability, negligence, fraud, and loss of consortium stemming from Mr. Yocum's exposure to asbestos while serving in the U.S. Navy from 1965-1972, and his resulting diagnosis of mesothelioma.  (*See generally* FAC.)  With respect to Westinghouse, the FAC only alleges strict products liability/design defect and loss of consortium.  (*See* FAC 2.)  Westinghouse was served with the FAC on January 13, 2016.  (*See* Removal.)

On February 7, 2017, two days after Mr. Yocum's death, Plaintiffs served Defendants with a Notice of Death.  (Mot. 1.)  On February 9, 2017, Westinghouse removed the action to this Court based on the claim that, at the time of Mr. Yocum's alleged exposure, Westinghouse was acting under the direction of the U.S. Navy, and is therefore entitled to assert federal officer jurisdiction under 28 U.S.C. § 1442(a)(1) ("Section 1442").  (*See* Removal 6-7.)  Although the other Defendants did not join in the Removal, it is unnecessary, as "a federal officer or agency defendant can unilaterally remove a case under Section 1442.  *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006).

II.      <u>DISCUSSION</u>

In the instant Motion, Plaintiffs make both procedural and substantive attacks on Westinghouse's jurisdictional allegations. (Mot. 5.)  Procedurally, Plaintiffs contend that removal was premature because upon Mr. Yocum's death, there was no case pending in Superior Court.  (Mot. 5.)  Substantively, Plaintiffs contest that Westinghouse cannot invoke federal officer jurisdiction because it cannot establish a colorable federal defense nor a causal nexus between Plaintiffs' claims and the acts taken under the direction of a federal office.  (Mot. 5.)

In response to these challenges, Westinghouse contends that a portion of Mr. Yocum's exposure to asbestos-containing insulation supplied by Westinghouse was during his four month stint on the A1W prototype at the NRF–a government-owned nuclear propulsion laboratory and training facility in Idaho which Westinghouse helped operate.  (Opp'n 1, ECF No. 30.)  Furthermore, Westinghouse provides testimonial and documentary evidence which it claims shows that the

CASE NO.:  CV 17-01061 SJO (AJWx)          DATE:  May 1, 2017

Navy was constantly monitoring and supervising Westinghouse during the construction and operation of both the NRF and the A1W.  (Opp'n 2.)

In their Reply, Plaintiffs challenge the admissibility of the evidence offered in support of the Opposition, and contend that Westinghouse failed to meet its burden of proof with respect to the existence of a colorable federal defense.  (Reply 1, ECF No. 33.)

    A.    <u>Westinghouse's Motion to Strike Plaintiffs' Reply</u>

The Court first turns to Westinghouse's Motion to Strike Plaintiffs' Reply ("Motion to Strike") for violating the Court's Initial Standing Order ("ISO").  (*See* Def's Mot. Strike Pl.'s Reply ("Mot. Strike") 4, ECF No. 40; *see also* ISO, ECF No. 12.)  Specifically, Westinghouse argues that the Reply improperly asserts evidentiary objections and exceeds the five-page limit.  (*See* Mot. Strike.)  The Court agrees.

The Court **SUSTAINS** Westinghouse's objection to the improper evidentiary objections made in Plaintiffs' Reply.  The ISO clearly requires parties to lodge evidentiary objections in a separate statement and not to argue those objections in the moving papers.  (ISO, Ex. A ¶ 24(a).)  As such, the Court will not consider any of these objections, and **STRIKES** pages 2:5-6:20 of Plaintiffs' Reply.

The Court also **SUSTAINS** Westinghouse's objection to the improper length of the Reply.  Plaintiffs' Reply is 13 pages, well over the ISO's five-page limit.  (*See generally* Reply.)  Therefore, the Court will only consider the first five pages of the Reply, excluding the evidentiary objections.  (*See supra*.)  Accordingly, the Court **STRIKES** pages 11 to 13 of the Reply.

The remainder of Westinghouse's Motion to Strike and exhibits attached thereto–which responds to Plaintiffs' evidentiary objections–is **DENIED AS MOOT**.  (*See* Mot. Strike.)  The Court also **DENIES AS MOOT** Westinghouse's Request for Judicial Notice in Support of its Motion to Strike.  (*See* Def.'s Req. for Judicial Notice in Supp. Mot. Strike, ECF No. 41.)  Finally, on April 4, 2017, Plaintiffs concurrently filed:  (1) evidentiary objections to Westinghouse's Opposition, (ECF No. 44), and (2) a second reply brief, (ECF No. 45), in an attempt to cure the problems with its original Reply.  These documents are untimely filed and, if considered, would represent an impermissible second bite of the apple for Plaintiffs.  As such, the Court **STRIKES** these documents.

    B.    <u>Plaintiffs' Motion to Remand</u>

The Court now turns to the merits of Plaintiffs' Motion.

"It is a fundamental precept that federal courts are courts of limited jurisdiction."  *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978).  "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears."  *Stock W., Inc. v. Confederated*

*Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989) (citation omitted).  Lack of subject matter jurisdiction may be raised by any party at any time, and it is never waived.  *See United States v. Cotton*, 535 U.S. 625, 630 (2002); *Miguel v. Country Funding Corp.*, 309 F.3d 1161, 1163-64 (9th Cir. 2002).

An action is removable to federal court only if it could have been brought there originally. *See* 28 U.S.C. § 1441(a).  The Ninth Circuit has held that courts must "strictly construe the removal statutes against removal jurisdiction" and reject federal jurisdiction "if there is any doubt as to the right of removal in the first instance."  *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (citations omitted).  "The strong presumption against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper."  *Id.* (citations and internal quotation marks omitted).

The Court addresses Plaintiffs' procedural and substantive attacks in turn.

  1.  <u>Plaintiffs' Procedural Attack is Untimely</u>

Plaintiffs argue that Westinghouse's jurisdictional allegations are facially insufficient because the Removal was unripe.  (Mot. 6.)  Plaintiffs maintain that under California law, Mr. Yocum's death effectively suspended the case until Plaintiffs filed a motion to continue it through a "personal representative" or "successor in interest."  (*See* Mot. 6) (citing Cal. Code Civ. Proc §§ 377.31-377.32.)  Pursuant to Federal Rules of Civil Procedure ("Rules"), however, a "motion to remand . . . on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal . . . ."  Fed. R. Civ. P. 1447(c); *see N. Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1038 (9th Cir. 1995).  "Untimely removal is a procedural rather than a jurisdictional defect," *Maniar v. F.D.I.C.*, 979 F.2d 782, 785 (9th Cir. 1992), and an objection to timely removal "can be waived."  *Kelton Arms Condo. Owners Ass'n, Inc. v. Homestead Ins. Co.*, 346 F.3d 1190, 1192 (9th Cir. 2003).  Plaintiffs' contention that removal was unripe must have been filed within 30 days of the filing of the Removal.  The Motion was filed on March 13, 2017—32 days after the Removal was filed on February 9, 2017.  (*See generally* Mot.)  Accordingly, this challenge is untimely, and the Court **DENIES** Plaintiffs' Motion as it pertains to this alleged procedural defect.

  2.  <u>The Court has Subject Matter Jurisdiction Pursuant to Section 1442</u>

Plaintiffs also raise a substantive, "factual" challenge to Westinghouse's jurisdictional allegations. (*See generally* Mot.)  In response to a factual attack, which contests the truth of the nonmovant's factual allegations, the nonmovant "must support its jurisdictional allegations with competent proof . . . under the same evidentiary standard that governs in the summary judgment context." *Leite v. Crane Co.*, 794 F.3d 1117, 1121 (9th Cir. 2014) (citations omitted).  The nonmovant "bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-

matter jurisdiction has been met." *Id.* If the existence of jurisdiction turns on disputed factual issues, however, the Court may resolve those factual disputes itself. *Id.*

As previously indicated, Defendants removed this case pursuant to Section 1442, the federal officer removal statute. (*See generally* Removal.) Section 1442 permits removal of civil actions that are filed against or directed to:

> The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1). While section 1441 removals are to be strictly construed against removal, Section 1442 removals are "liberally construed" in favor of removal because "the right of removal is absolute for conduct performed under the color of federal office." *Durham*, 445 F.3d at 1251 (citing *Colorado v. Symes*, 286 U.S. 510, 517 (1932)); *see also Ariz. v. Manypenny*, 451 U.S. 232, 242 (1981). Federal officers, agents, and contractors may remove cases based on acts performed under color of a federal office if they assert a colorable federal defense. *Durham*, 445 F.3d at 1251. The party seeking removal "need not win his case before he can have it removed." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

A federal contractor may properly remove an action under Section 1442 when the defendant: (1) is a "person" within the meaning of the statute; (2) can demonstrate a causal nexus between the plaintiff's claims and the actions it took pursuant to the direction of a federal officer; (3) and raises a colorable defense based upon federal law. *See Leite*, 749 F.3d at 1120; *Durham*, 445 F.3d at 1251; *Mesa v. California*, 489 U.S. 121, 129-35 (1989); *see also Fung v. Abex Corp.*, 816 F. Supp. 569, 571-72 (N.D. Cal. 1992). For the following reasons, the Court finds that Westinghouse has shown each requirement by a preponderance of the evidence.

        a.    <u>Westinghouse is a "Person"</u>

With regard to the first requirement–that the defendant be a "person"–Defendant is a corporation, which constitutes a "person" for the purpose of Section 1442. *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998); *Fung*, 816 F. Supp. at 572; *Blackman v. Asbestos Defendants (BHC)*, No. CV 97-03066, 1997 WL 703773, at *2 (N.D. Cal. Nov. 3, 1997). Further, Plaintiffs do not dispute that Defendant is a person under the statute. (*See generally* Mot.) The Court considers the statute's remaining requirements below.

   b. Westinghouse's Military Contractor Defense is a "Colorable Defense"

For removal to be proper under Section 1442, the defendant must raise a colorable defense based upon federal law. *Mesa*, 489 U.S. at 124-25. To state a colorable defense, the removing defendant need not show that the defense is meritorious, but merely that there is a legitimate question of federal law to be decided regarding the validity of the defense. *Id.* at 129; *see also Willingham*, 395 U.S. at 406-07. Here, Westinghouse asserts the military contractor defense recognized in *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988), and *In re Haw. Fed. Asbestos Cases*, 960 F.2d 806, 810 (1992). Due to the specific contours of the military contractor defense, its analysis lends itself to significant factual overlap with that of the "causal nexus" requirement of Section 1442 removal analysis. *See Leite*, 794 F.3d at 1124. Accordingly, the Court will first address the military contractor defense, before turning to the "causal nexus" requirement.

*Boyle* and its progeny hold that "liability for design defects in military equipment cannot be imposed [on military contractors] . . . when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. The Ninth Circuit has further articulated that the military contractor defense is only available when the contractor produced **military equipment** for the United States, and does not apply to "an ordinary consumer product purchased by the armed forces." *In re Haw.*, 960 F.2d at 811-12. The Court first turns to whether the A1W prototype is "military equipment" produced for the U.S., and concludes that it is.

   i. The A1W Constitutes Military Equipment

Mr. Yocum's alleged exposure to asbestos-containing insulation supplied by Westinghouse occurred, at least partly, while he trained on the A1W prototype at the NRF in 1966. (Opp'n 1.) During that time period, Westinghouse was contracted to assist the Navy in constructing and operating the A1W. (Opp'n 2.) Westinghouse contends that the A1W constituted military equipment, and that the Navy required Westinghouse to use asbestos-containing insulation in its construction. (Opp'n 8.)

The purpose of the "military equipment" requirement is to prevent companies that merely provide ordinary consumer products to the armed forces from being immunized from liability for the injuries caused by those goods. *In re Haw.*, 960 F.2d at 811-12. For example, if the military orders "a quantity of stock helicopters that **happen to be equipped** with escape hatches opening outward, it is impossible to say that the Government had a significant interest in that particular feature." *Id.* at 811 (emphasis added). "Where the goods ordered by the military are those readily available in substantially similar form to commercial users, the military contractor defense does not apply." *Id.*; *see, e.g., Moore v. Asbestos Defendants (B*P)*, No. CV 10-01638, 2010 WL 2650487, at *3 (N.D. Cal. Jul 1, 2010) (asbestos-containing thermal insulation sold to the military by a private company did not constitute military equipment because it was available to ordinary consumers);

*Delahaye v. Asbestos Defendants*, No. CV 09-05504, 2010 WL 366611, at *1 (N.D. Cal. Jan. 25, 2010); *Fong v. Asbestos Defendants (B*P)*, No. CV 10-00287, 2010 WL 1526099, at *1 (N.D. Cal. Apr. 15, 2010). However, when the military contracts with private companies to manufacture equipment for military usage, it makes "highly complex and sensitive decisions regarding the development of new equipment for military usage." *In re Haw.*, 960 F.2d at 811. "Allowing the contractors who are hired to manufacture that equipment to be sued for the injuries caused by it would impinge unduly on the military's decision-making process." *Id.*

Westinghouse proffers extensive documentary and testimonial evidence in support of its position. (*See generally* Opp'n; Jamison Decl.) First, it contends that the Navy worked closely with industry experts to develop a design that conformed to specific military requirements. (*See* Jamison Decl., Ex. G, Aff. of Retired Rear Admiral Roger Horne ("Horne Aff.") 5.) The Navy then developed detailed design specifications ("MilSpecs"), and entertained bids from private contractors with the capability to manufacture a system that satisfied these military requirements. (Horne Aff. 5.) At all times the contractors, including Westinghouse, were governed by both the MilSpecs and several federal officers who exercised control over the contractors whenever they built and supplied nuclear reactor components and turbines to the Navy. (Horne Aff. 9.)

With respect to the use of asbestos-containing insulation, "it was the Navy, not contract manufacturers, that required the use of asbestos thermal insulation with nuclear reactor components and turbines intended for installation on Navy ships." (Horne Aff. 12.) In support, Westinghouse provides copies of the MilSpecs used to design the *USS Enterprise*'s Nuclear Reactor, of which the A1W is a prototype. (*See* Decl. of Thomas McCaffery in Supp. Def's Opp'n ("McCaffery Decl.") ¶ 13(a), Ex. 2 ("*Enterprise* MilSpecs"), ECF No. 30-10.) These MilSpecs "demanded the use of asbestos thermal insulation [for] its nuclear reactor components . . . ." (Horne Aff. 12.) For example, all of the reactor tubing and piping on both the *USS Enterprise* and the A1W were required to contain insulation compliant with MilSpec MIL-I-2781B, Grade II, Class C. (*See Enterprise* MilSpecs 10.) According to the "Military Qualified Products List," the only Grade II, Class C compliant insulation was Unibestos, an asbestos-containing product. (McCaffrey Decl., Ex. 3.)

Based on this evidence, Defendant argues that it produced military equipment, and therefore is entitled to assert the military contractor defense. (Opp'n 10.) Plaintiffs, on the other hand, contend that the asbestos-containing insulation did not constitute military equipment because it was a commercially available product. (Mot. 8.) The Court agrees with Westinghouse, and finds that the A1W constitutes military equipment. Westinghouse neither simply sold a product to the Navy that happened to contain asbestos insulation (*e.g.*, the stock helicopters), or merely provided the Navy with asbestos insulation for use on a ship. *See, e.g.*, *Moore*, 2010 WL 2650487, at *3; *Delahaye*, 2010 WL 366611, at *1; *Fong*, 2010 WL 1526099, at 1*. Rather, according to Westinghouse's evidence, Westinghouse was contracted by the Navy to construct a complex

piece of military training equipment according to precise military specifications. The Navy–not Westinghouse–required that the A1W be equipped with asbestos-containing thermal insulation. (*See Enterprise* MilSpecs 10; McCaffrey Decl., Ex. 3.) Accordingly, the A1W qualifies as military equipment under *In re Hawaii*.

### ii. Westinghouse Provides Sufficient Evidence to Assert the Military Contractor Defense

Having determined that the A1W is military equipment, the Court now turns to the elements of the military contractor defense: that "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

Plaintiffs argue that while the Navy may have "rubber-stamped" the use of asbestos-containing insulation in the A1W, it did not require it; therefore, Westinghouse was not adhering to "reasonably precise specifications." (Mot. 10; Reply 9.) Again, and for the following reasons, the Court disagrees.

In support of their position, Plaintiffs rely heavily on a recent case in this District, *Walek v. Boeing Company*, where a company unsuccessfully attempted to assert the military contractor defense because it supplied the military with asbestos-containing aircraft brakes. No. CV 15-00309, 2016 WL 910150, at *1 (C.D. Cal. Mar. 9, 2016). The court noted that proof showing that the military **required** the use of asbestos-containing insulation would have sufficed to show that the contractor was adhering to precise military specifications.[1] *Id.* at *6. The defendant, however, did not provide the specifications which purportedly required asbestos, or any other evidence that the military made a discretionary decision to use asbestos-containing insulation. *Id.* Here, as previously discussed, Westinghouse has provided the military specifications which show that the Navy in fact **required** the use of asbestos in the construction of the A1W. (*See Enterprise* MilSpecs 10; McCaffrey Decl., Ex. 3.) As such, Westinghouse has established that the Navy approved

---

[1] "One way to show 'reasonably precise specifications' is to prove that the United States **required the defect**." *Walek*, 2016 WL 910150, at *4 (citing *Prewett v. Gould Pumps (IPG)*, No. CV 09-00838, 2009 WL 2959877, at *5 (W.D. Wash. Sep. 9, 2009)). This can also be established through evidence showing "that the government was involved in the decision to use asbestos," or that the government and the contractor "engaged in a continuous back and forth review process regarding the defective feature." *Id.* "When only minimal or very general requirements are set for the contractor by the United States the rule is inapplicable. *Id.* (quoting *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 450 (9th Cir. 1983)). "The situation is very different where the United States reviewed and approved a detailed set of specifications." *McKay*, 704 F.2d at 450.

"reasonably precise specifications," to which Westinghouse conformed. *Boyle*, 487 U.S. at 512.

Finally, with respect to the last element of the military contractor defense, Westinghouse provides evidence that the Navy had been aware of the health hazards related to asbestos exposure since the 1920s, and "had become a leader in the field of occupational medicine relating to . . . asbestos dust inhalation exposure" by the early 1940s. (*See* Jamison Decl., Ex. H.) Despite this knowledge, the Navy continued to use asbestos-containing insulation on its ships, particularly nuclear-powered ships, because it was the most effective thermal insulation available. (*See* Horne Decl. ¶ 29.) Accordingly, there is no indication of "dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. As such, Defendant has satisfied the final element of the military contractor defense.

For the foregoing reasons, the Court finds that Westinghouse has met each of the requirements of the military contractor defense, and has therefore asserted a colorable federal defense.

### c. A Causal Nexus Exists Between Plaintiffs' Claims and Westinghouse's Actions Taken Pursuant to Federal Direction

Finally, to satisfy the "causal nexus" prong, the defendant must "by direct averment[,] exclude the possibility that [his actions were] based on acts or conduct . . . not justified by his federal duty." *Mesa*, 489 U.S. at 132 (citation and quotation marks omitted). "The 'causal nexus' between a federal officer's directions and the private actor 'must be predicated on a showing that the acts forming the basis of the state suit were performed pursuant to an officer's 'direct orders or comprehensive and detailed regulations.'" *Cabalce v. VSE Corp.*, 922 F. Supp. 2d 1113, 1122 (D. Haw. 2013) (citations omitted). Based on the evidence previously discussed, Westinghouse has shown that its actions were performed pursuant to the direct orders of the Navy, and that as a result, Mr. Yocum was exposed to asbestos. *See* Section II.B.2.b., *supra*. Accordingly, Defendant has satisfied the causal nexus requirement.

In sum, Defendant has provided competent proof sufficient to satisfy each of the elements necessary for a federal contractor to remove an action under Section 1442.

### III. RULING

For the foregoing reasons, Plaintiffs' Motion to Remand is **DENIED**. The scheduling conference set for Monday, June 26, 2017 remains set.

IT IS SO ORDERED.

Initials of Preparer: SMO